# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00076-CV

---

**R. S. S. and N. M., IV, Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 428TH DISTRICT COURT OF HAYS COUNTY**
**NO. 20-0790, THE HONORABLE DWIGHT E. PESCHEL, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Following a jury trial, the district court terminated the parental rights of R.S.S. (Mother) and N.M., IV (Father), to their child S.M. (Daughter), born April 7, 2020. Mother and Father each appealed. Mother's appointed counsel has filed a brief concluding that her appeal is frivolous and without merit. *See Anders v. California*, 386 U.S. 738, 744 (1967). Father challenges the sufficiency of the evidence supporting the predicate statutory ground for terminating his parental rights, failure to complete services. *See* Tex. Fam. Code § 161.001(b)(1)(O). We will affirm the district court's order.

## BACKGROUND

The case began in April 2020 when the Department of Family and Protective Services (the Department) received a report alleging that Mother had tested positive for marijuana and amphetamines upon giving birth to Daughter, who also tested positive for

amphetamines. In response to the report, Department investigator Gina Martinez went to the hospital where Daughter was born and spoke with Mother, Father, and Dr. Jon Mazursky, a pediatrician and neonatologist who provided medical care to Daughter following her birth. Dr. Mazursky expressed to Martinez "significant concerns" about Daughter's health and welfare if she were to be released to Mother and Father. Shortly thereafter, the Department filed its Original Petition for Protection of a Child, For Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship, seeking emergency removal of Daughter from her parents and temporary conservatorship of the child. The district court granted the Department temporary conservatorship of Daughter.

To obtain reunification with Daughter, Mother and Father each were ordered by the district court to comply with the terms of a Family Service Plan. Among other requirements, Mother was ordered to complete a drug and alcohol assessment, submit to random drug screenings, attend NA/AA meetings twice monthly, submit to a psychological evaluation, engage in individual therapy, complete protective parenting classes, maintain appropriate housing, avoid criminal activity and criminal associations, attend all court hearings, and maintain monthly contact with the Department. Father was similarly required to engage in individual therapy, submit to a psychological evaluation, complete protective parenting classes, attend all court hearings, maintain monthly contact with the Department, maintain employment, maintain appropriate housing, and avoid criminal activity and criminal associations. The plan also required Father to report any interactions with law enforcement to his caseworker within 48 hours and keep the Department up to date on any current or pending criminal case. The service plan was later modified to include requirements that Mother complete a 90-day inpatient drug

2

treatment program and that Father complete an Outreach Screening Assessment Referral (OSAR) for substance abuse and undergo drug and alcohol testing.

Father tested positive for methamphetamines and amphetamines in July 2020 and September 2020 and failed to drug test in August 2020 and November 2020. In December 2020, Father was arrested for and charged with the offense of continuous violence against a family member, specifically Mother, for an incident that allegedly occurred in November 2020. Thereafter, Father failed to complete his services. Mother also failed to complete her services, including those related to her drug usage. After being discharged from inpatient drug treatment in August 2020, she tested positive for methamphetamines, amphetamines, and marijuana in November 2020. Although Mother tested negative for drugs in February and March 2021, she tested positive again in April 2021 and failed to attend drug tests in June, July, August, September, and October 2021, which the Department treated as positive tests.

In January 2022, the case proceeded to trial. Witnesses included Mother; Father; doctors and a social worker from the hospital where Mother gave birth to Daughter; a CPS investigative supervisor; officers with the Hays County Sheriff's Office who had responded to and investigated the report of domestic violence committed by Father against Mother; Daughter's foster mother and foster father, who testified that they wanted to adopt Daughter and explained that she was doing well in their care; Mother's mother; Father's father; Steve Russell, Father's former parole officer[1]; and William O'Brien, a conservatorship caseworker who had been assigned to Daughter's case. We discuss the evidence in more detail below as it is relevant to each parent's appeal.

---

[1] Father was convicted in December 2014 for the offense of possession with intent to deliver cocaine in an amount between four and two-hundred grams and was sentenced to ten years' imprisonment. Father was paroled for that offense in May 2018.

At the conclusion of trial, the jury found that the parental rights of Mother and Father to Daughter should be terminated. Regarding Mother, the jury found that termination of Mother's parental rights was in the best interest of Daughter and that Mother had: (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; and (3) used a controlled substance in a manner that endangered the health or safety of the child and, after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance. *See id*. § 161.001(b)(1)(D), (E), (P), (2). Regarding Father, the jury found that termination of Father's parental rights was in the best interest of Daughter and that Father had failed to comply with the provisions of a court order that specifically established the actions necessary for Father to obtain the return of the child. *See id*. § 161.001(b)(1)(O), (2). The district court rendered judgment in accordance with the jury's verdict. These appeals followed.

## DISCUSSION

### Father's appeal

In his sole issue on appeal, Father asserts that the evidence is legally and factually insufficient to support the predicate statutory ground for termination, failure to comply with the provisions of a court order that specifically established the actions necessary for Father to obtain the return of the child. *See* Tex. Fam. Code § 161.001(b)(1)(O). However, Father does not dispute that he failed to comply with the requirements of his Family Service Plan. Rather, he contends that his failure to comply was not his fault.

4

*Standard of review*

"Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the child's best interest." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see N.G.*, 577 S.W.3d at 232; *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007; *Holick*, 685 S.W.2d

5

at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id*.

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id*. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

However, "an appellate court's review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id*. "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id*.

6

*Relevant law*

In this case, the statutory basis for terminating Father's parental rights is Section 161.001(b)(1)(O). "[T]o terminate parental rights under section 161.001(b)(1)(O): (1) the parent must have failed to comply with the provisions of a court order, which (2) specifically established the actions necessary for the parent to receive custody of the child from the Department, which serves as the permanent or temporary conservator of the child." *N.G.*, 577 S.W.3d at 237 (citing Tex. Fam. Code § 161.001(b)(1)(O)). Also known as a family-service plan, an "order referenced by section 161.001(b)(1)(O) is a mandate or directive that establishes some steps or actions necessary for the parent to obtain return of the child who is in the Department's custody." *Id*. at 238. "The burden of complying with the court order is on the parent." *In re S.J.R.-Z.*, 537 S.W.3d 677, 690 (Tex. App.—San Antonio 2017, pet. denied). "The Family Code does not provide for substantial compliance with a family-service plan." *In re M.C.G.*, 329 S.W.3d 674, 676 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). "Subsection (O) looks only for a parent's failure to comply with a court order, without reference to quantity of failure or degree of compliance." *In re D.N.*, 405 S.W.3d 863, 877 (Tex. App.—Amarillo 2013, no pet.). Thus, a parent may violate subsection (O) even when the parent had "sporadic incidents of partial compliance" with the court order. *In re J.F.C.*, 96 S.W.3d 256, 278 (Tex. 2002). On the other hand, "whether a parent has done enough under the family-service plan to defeat termination under subpart (O) is ordinarily a fact question" decided on a case-by-case basis. *In re S.M.R.*, 434 S.W.3d 576, 584 (Tex. 2014). Thus, the factfinder may terminate parental rights for failure to fully comply with the service plan but is not required to do so as a matter of law. *See id*.; *see also M.D. v. Texas Dep't of Fam. & Protective Servs.*,

7

No. 03-20-00531-CV, 2021 WL 1704258, at *10 (Tex. App.—Austin Apr. 30, 2021, no pet.) (mem. op.).

Moreover, a court may not terminate parental rights under Subsection (b)(1)(O) based on the parent's failure to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that: "(1) the parent was unable to comply with specific provisions of the court order; and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent." Tex. Fam. Code § 161.001(d). Section 161.001(d) is an affirmative defense to subsection (O) that places the burden of proof on the parent. *See id.*; *In re M.P.*, 618 S.W.3d 88, 101–02 (Tex. App.—Houston [14th Dist.] 2020), *rev'd on other grounds*, 639 S.W.3d 700 (Tex. 2022); *see also In re G.A.*, No. 10-21-00001-CV, 2021 WL 1686721, at *2 (Tex. App.—Waco Apr. 28, 2021, no pet.) (mem. op.). Additionally, the parent must satisfy this burden for each specific provision of the court order that the State claims he failed to complete. *See In re E.F.*, 591 S.W.3d 138, 144 (Tex. App.—San Antonio 2019, no pet.). For example, if the State alleges that a parent failed to complete mandatory drug testing and failed to complete parenting classes, the parent must prove that he made a good faith effort to complete both drug testing and parenting classes and that his failure to complete each was through no fault of his own. *See id.*

Finally, a parent's incarceration does not *ipso facto* excuse non-compliance with a service plan. Although a parent's incarceration might in some cases excuse a parent's failure to complete services unavailable to him during the time of his incarceration, it does not excuse a parent's failure to complete services available to him while incarcerated or any failure to comply with the requirements of the plan before he was incarcerated. *See, e.g.*, *D.L.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00369-CV, 2020 WL 7041564, at *4 (Tex. App.—Austin

8

Nov. 30, 2020, pet. denied) (mem. op.) (concluding that "to the extent that Father's failure to comply with the family-service plan could be explained in part due to his incarceration and the COVID restrictions at the jail that began in March 2020," record supported district court's finding that, "in the almost five months before his incarceration, Father had not attempted in good faith to comply with the order and that his failure to comply was attributable at least in part to his own fault"); *W.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00713-CV, 2020 WL 1281643, at *5 (Tex. App.—Austin Mar. 18, 2020, pet. denied) (mem. op.) (concluding that record supported district court's finding that parent failed to meet his burden to show good-faith attempt to comply when evidence "showed that he did not comply with the court-ordered services during the time period that the case was pending and he was not incarcerated"); *K.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00184-CV, 2017 WL 3585255, at *2 (Tex. App.—Austin Aug. 17, 2017, no pet.) (mem. op.) (evidence was legally and factually sufficient to support termination under subsection (O) when record showed that services were available to parent in jail but parent chose not to complete them).

### Application

The record reflects that the Family Service Plan was created by the Department and became an order of the court in May 2020. In December 2020, Father was arrested for assaulting Mother and incarcerated in the Hays County Jail, where he remained at the time of trial. Thus, Father had approximately seven months before his incarceration to work on the service plan. Father testified that he was aware the service plan was an order of the court and that the Department had discussed with him the terms of the plan. However, he claimed that at the beginning of the case, the requirements of the plan "confused" him.

9

Caseworker O'Brien testified that he had discussed the Family Service Plan with Father and that Father "could articulate" to him the requirements of the plan. O'Brien disputed Father's claim that the plan "confused" him. He explained:

> I was very clear. I had even sent e-mails listing the specific providers, their numbers. All he had to do was call the number. I sent in the referrals for all these providers very early on in the case.

> So I tell my parents, All you have to do is—I've done all the work. You just have to call the number and schedule the appointments, and that's all that needs to be done.

> They were also discussed regularly in our permanency hearings throughout the case. So not only me, but the judge also got to speak to these as well as [Father] got to speak over these with his attorney. Those conversations I, of course, would be unaware of, but through me alone I believe he had all the information to be successful in completing his plan, outside of even having a physical copy of the plan provided to him from the beginning of the case.

O'Brien testified that he had a "contentious" relationship with Father during the case, especially in the last month prior to his incarceration: "[B]efore he was incarcerated, my last month with him was probably the most contentious. He told me twice, once over a Zoom meeting and once in text, that he was done. He refused to work services. You know, he told me to go 'f' myself multiple times, said he wanted to tear the Department apart brick by brick."

O'Brien acknowledged that Father had complied with some aspects of the service plan before his incarceration. Specifically, Father maintained employment and appropriate housing, completed his psychological evaluation and his OSAR, and attended his scheduled visits with Daughter. O'Brien also explained that Father was "involved for a time" with individual therapy: "He attended a few sessions, notified me he didn't want to do them anymore,

10

took some time off, and then he completed three more sessions before he was incarcerated, so he completed eight sessions total. They were usually weekly." However, O'Brien testified that Father had not been successfully discharged from therapy.

Father also failed to complete protective parenting classes. Although the jail did not provide those classes, the Department had provided Father with a "jail packet" of parenting information that O'Brien described as "some literature to read through and to write in." O'Brien explained that although the packet is "not a parenting class," "it at least shows something that [Father] can work on while in the jail." O'Brien had not been informed that Father had done any work on the packet, although Father testified that he "wrote ten pages" of responses to questions contained in the packet and had provided those responses to his attorney.

Father also failed to maintain contact with O'Brien for three months from July through October 2020. O'Brien explained that during this time period, Father "didn't respond to me sending him in for drug tests or replying to my monthly outreaches for our face-to-face contacts for the month." O'Brien added, "Post his incarceration there have been—we don't meet monthly because sometimes the jails have troubles or they're not available, but that's not due to him. But beforehand, when it was his responsibility, he missed three months, but he attended the others." O'Brien also testified that Father did not report to him his November 12, 2020 interaction with law enforcement (the date when police responded to and began investigating Father's alleged assault of Mother) until after Father was arrested for and charged with the offense in December 2020, which violated the plan's 48-hour notification requirement.

O'Brien further recounted that Father had failed to take two drug tests in November 2020. One test date coincided with Veteran's Day, and Father told O'Brien that he "assumed everything would be closed so he decided just not to go." However, O'Brien had

11

called the testing facility and "ensured that they were open" that day. In a text message sent to Father the following day, O'Brien asked Father if he had showed up for his drug test and said that if he had not, O'Brien had "extended the referral" so that Father could test that day instead. In response, Father wrote, "No, I did not. Everything was closed due to Veteran's Day. Mr. O'Brien, go fuck yourself." Father also texted O'Brien, "No longer doing your services. I will speak to the judge." Father later added, "I'm no longer doing your services. Prepare for trial." Two weeks later, when O'Brien again ordered Father to take a drug test, Father texted him, "[Y]our trick around the holidays is not going to work, Mr. O'Brien. It's the day before Thanksgiving and people have plans with family so shove that drug test up your ass." There were at least two other drug tests that Father had missed because he went to the wrong testing facility, and O'Brien testified that "there were times when [Father] just said, I'm not going. Most of the times he just would be nonresponsive with me." Father's failure to test led O'Brien to believe that Father was still using drugs. O'Brien explained:

> He has only tested twice for the Department. Both times he's been positive. The other six or seven times that he refused to test, I can only assume that those are positive as well as is our policy. We tell parents, if you don't test for me, I'm just going to assume that you're positive otherwise because we have no way to know.

Father, during his testimony, invoked his Fifth Amendment privilege not to incriminate himself in response to a question as to when he last used methamphetamines. He acknowledged, however, that he had used methamphetamines in the past.

Regarding the requirement that he attend individual therapy, Father testified that he had attended "eight sessions or more" and that he had attempted to continue his sessions while incarcerated but could not do so because the Department had failed to "follow through" with his

12

request to provide him with a therapist. Father also claimed that he had not completed his parenting classes because he had been misinformed by his caseworker that those classes would be combined with his individual therapy. Father acknowledged that he "may have missed one or two" of the court hearings that he was required to attend but claimed that this was the fault of his "legal representation." Father also acknowledged that he did not take all the drug tests that he was ordered to take but claimed that this was because he was ordered to take one test on a holiday and because, for another missed test, the testing facility had tried to charge him $50 for the test, but Father "didn't want to pay $50 so [he] did not take the test."

In summary, Father presented some evidence that he made a good-faith effort to comply with some of his services and that his failure to complete those services was not his fault. Specifically, Father testified that he had engaged in individual therapy before his incarceration and attempted to continue his therapy while incarcerated, but he could not do so because the Department failed to provide him with a therapist, even though he had requested one. Father also testified that he was led by his caseworker to believe that his protective parenting classes were included in his individual therapy and that, although the jail did not offer such classes, Father worked on a "jail packet" containing parenting information and returned the packet to his attorney to give to the Department. Although O'Brien never received a copy of the packet showing Father's work, this is nevertheless some evidence that Father made a good-faith effort to do what he could to improve his parenting skills while in jail.

However, there was other evidence from which the jury could have reasonably inferred that Father had not made a good-faith effort to complete individual therapy and protective parenting classes and that his failure to complete those services was at least partly his fault. Regarding individual therapy, O'Brien testified that Father "attended a few sessions,"

13

notified O'Brien that "he didn't want to do them anymore" and "took some time off," and then completed three more sessions before he was incarcerated, for a total of eight sessions. According to O'Brien, the sessions were "usually weekly," so the jury could have reasonably inferred that if Father had not taken "some time off" and decided that he "didn't want to do them anymore," he could have completed more than eight therapy sessions in the seven months before his incarceration. Regarding protective parenting, Father did not take any protective parenting classes in the seven months before his incarceration, and the jury was not required to credit Father's claim that he had been led to believe that they were included in his individual therapy sessions.

Additionally, even if the jury had believed Father's testimony regarding individual therapy and protective parenting, Father before his incarceration failed to comply with other requirements of the service plan, and the jury could have found that Father did not make a good-faith effort to comply with those requirements. Specifically, Father failed to maintain contact with O'Brien from July through October 2020, failed to take required drug tests in November 2020, and failed to notify the Department of his interaction with law enforcement within 48 hours of that November 12, 2020 interaction, waiting instead until after he had been arrested and charged in December 2020 with assaulting Mother. The jury could have reasonably inferred that these failures were entirely Father's fault, particularly considering his vulgar text messages to O'Brien in November 2020 stating that he was "no longer doing services."

On this record, viewing the evidence in the light most favorable to the finding, we conclude that the evidence is legally sufficient to prove that Father failed to comply with the provisions of a court order that specifically established the actions necessary for Father to obtain the return of Daughter. We also conclude that the evidence contrary to the finding is not "so

14

significant that the factfinder could not have formed a firm belief or conviction" that Father failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of Daughter. Thus, the evidence is also factually sufficient to support the finding. For the same reasons, we further conclude that the evidence is legally and factually sufficient to support the jury's finding that Father failed to carry his burden to prove, by a preponderance of the evidence, that he made a good faith effort to comply with the court order and that his failure to comply with the court order is not attributable to any fault of Father.

We overrule Father's sole issue on appeal.

**Mother's appeal**

Mother's court-appointed counsel has filed a motion to withdraw and an *Anders* brief concluding that her appeal is frivolous and without merit. *See* 386 U.S. at 744; *In re P.M.*, 520 S.W.3d 24, 27 & n.10 (Tex. 2016) (per curiam) (approving use of *Anders* procedure in appeals from termination of parental rights because it "strikes an important balance between the defendant's constitutional right to counsel on appeal and counsel's obligation not to prosecute frivolous appeals" (citations omitted)). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. *See* 386 U.S. at 744; *Taylor v. Texas Dep't of Protective & Regul. Servs.*, 160 S.W.3d 641, 646-47 (Tex. App.—Austin 2005, pet. denied). Counsel has certified to this Court that she has provided her client with a copy of the *Anders* brief and informed her of her right to examine the appellate record and to file a pro se brief. No pro se brief has been filed.

15

Upon receiving an *Anders* brief, we must conduct a full examination of the record to determine whether the appeal is wholly frivolous. *See Penson v. Ohio*, 488 U.S. 75, 80 (1988); *Taylor*, 160 S.W.3d at 647. In her testimony, Mother admitted that she used marijuana and methamphetamines while pregnant with Daughter but denied using any drugs after she learned that she was pregnant. Mother claimed that her positive drug test at the hospital when she gave birth to Daughter was possibly the result of Daughter's meconium rupturing inside of her uterus, thereby "contaminating" the test results. She also claimed that any positive test results after June 18, 2020, which she claimed was her "sobriety birth date," were the result of either her previous drug use before that date or because the test results were somehow inaccurate.

Mother also denied that Father had ever committed domestic violence against her, including on November 12, 2020, the date of the alleged assault. Other witnesses, however, including the officers who investigated the assault, testified that Mother had told them that Father had assaulted her, and photos showing Mother with bruises allegedly from the assault were admitted into evidence. Mother gave multiple explanations for the bruises, including a dog attack, anemia, and falling down the stairs. Mother testified that she remained in contact with Father, as recently as two weeks before trial.

Because Daughter tested positive for methamphetamines at birth, the Department sought and obtained a finding of aggravated circumstances against Mother. O'Brien testified that Mother complied with some requirements of her service plan but missed approximately 75% of her drug tests. Mother also failed to maintain regular contact with O'Brien, with their last communication being in June 2021. O'Brien testified that the Department's "greatest concern" with Mother is her continued use of methamphetamines. O'Brien added that he is more concerned now than he was at the beginning of the case because Mother had been provided tools

16

to assist in her recovery but continued to choose "drugs over her child."  O'Brien also expressed concern about Mother continuing to associate with Father even after he was jailed for assaulting her.

After reviewing the entire record and the *Anders* brief submitted on Mother's behalf, we have found nothing in the record that might arguably support an appeal.  Our review included the district court's endangerment findings, *see* Tex. Fam. Code § 161.001(b)(1)(D), (E), and we have found no issues that could be raised on appeal with respect to those findings, *see In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019).  We agree with counsel that Mother's appeal is frivolous.[2]

## CONCLUSION

We affirm the district court's order of termination.

_____
Gisela D. Triana, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed

Filed:  July 15, 2022

---

[2] We deny counsel's motion to withdraw.  The Texas Supreme Court has held that the right to counsel in suits seeking termination of parental rights extends to "all proceedings [in the Texas Supreme Court], including the filing of a petition for review." *In re P.M.*, 520 S.W.3d 24, 27-28 (Tex. 2016) (per curiam).  Accordingly, if after consulting with counsel Mother desires to file a petition for review, counsel should timely file with the Texas Supreme Court "a petition for review that satisfies the standards for an *Anders* brief."  *See id*.

17